1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

11   JEFFREY MCGRATH,                         )
12              Plaintiff,                    )        2:12-cv-1931 JWS
13      vs.                                   )        ORDER AND OPINION
14   CITY OF AVONDALE,                        )        [Re: Motion at Docket 29]
15              Defendant.                    )
16   _____ )

17                        **I.  MOTION PRESENTED**

18        At docket 29, Defendant City of Avondale ("Avondale") filed a motion for

19   summary judgment, requesting judgment in its favor on all claims in the complaint filed

20   by Plaintiff Jeffrey McGrath ("McGrath").  Its statement of facts in support is at

21   docket 30.  McGrath's response is at docket 35, and his statement of facts is at

22   docket 36.  Avondale's reply is at docket 43.  Avondale requested oral argument, but it

23   would not be of further assistance to the court.

24                        **II.  BACKGROUND**

25        This employment case involves the decision of Avondale to place McGrath, an

26   officer with the Avondale Police Department, on Administrative leave in 2009, as well as

27   the fit-for-duty ("FFD") evaluation process that Avondale is requiring McGrath to go

28

1  through in order to be reinstated as an active police officer.  At the time the parties

2  submitted their briefs, McGrath had not yet received clearance to return to work.

3  The Avondale Police Department hired McGrath on July 29, 2002.  McGrath

4  worked as a patrol officer, a school resources officer, and a drug abuse resistance

5  education officer.  In the spring of 2004, Avondale promoted McGrath to its new

6  motorcycle unit.  Sometime in 2004, McGrath filed a lawsuit against Avondale alleging

7  that employees had publicly disseminated information about a private medical

8  condition.[1]  McGrath and Avondale settled the lawsuit, and McGrath continued as an

9  active officer in the department's motorcycle unit through 2009.  During that time

10  McGrath received standard raises and good performance evaluations.

11  On October 20, 2009, McGrath suffered an emotional breakdown and left work

12  early.  Before leaving, he wrote an email to a supervising lieutenant indicating that he

13  had to leave to care for his wife, who was scheduled to give birth four days later.  Later,

14  however, in a letter to his supervisor, Sergeant Heard, McGrath confessed that he left

15  on October 20th not because his wife needed help prior to the birth of their son but

16  because he could not stop crying and was "losing control" of his emotions.  The letter to

17  Sergeant Heard indicated that he planned to return to work in November.

18  There was some confusion about McGrath's status after he wrote the letter to

19  Sergeant Heard, admitting his emotional breakdown.  Before McGrath wrote the letter, it

20  was assumed he needed time off for the pending birth of his son.  Kathy Reyes, the

21  Benefits Administrator for Avondale ("Reyes"), told him that he needed to get a doctor's

22  approval and fill out Family Medical Leave Act ("FMLA") paperwork in order to receive

23  leave for the four days he took off prior to his son's birth.[2]  McGrath told her he was not

24  going to take those four days as FMLA leave and that she could count it as vacation

25

26  [1]Both parties agree that McGrath's medical condition need not be named or described
27  for purposes of the motion.

28  [2]Doc. 30-1 at p. 33 (Ex. 3).

-2-

time.[3]  After the birth of his son, Reyes was under the impression that McGrath was using FMLA leave while he was out, but given the letter McGrath wrote to Sergeant Heard, Police Chief Kevin Kotsur placed McGrath on administrative leave with pay pending a FFD evaluation.[4]  McGrath asked Police Chief Kotsur to clarify his leave status because he was getting conflicting information from Reyes.  On November 23, Reyes and Kotsur informed McGrath that he was on administrative leave until he was assessed fit to resume his duties.[5]  Indeed, the FMLA paperwork was never completed.

Around this time Avondale also informed McGrath that in addition to a FFD evaluation process, he would be subject to a Performance Improvement Plan ("PIP") upon his return to duty because his performance had been inadequate in the months leading up to his October breakdown.  In the PIP, Sergeant Heard indicates that starting in April of 2009 McGrath had become deficient in writing reports, being timely, acting professional, and attending court hearings.[6]  The PIP details specific incidents.  The PIP then sets forth limitations that will be in place and expectations McGrath will have to meet in the event he is deemed fit to return to work as an officer.  McGrath signed the PIP, indicating that he understood the information in the document.

In late November of 2009, Avondale contracted with Dr. Celia Drake to complete McGrath's FFD evaluation.  McGrath signed an informed consent agreement whereby he agreed to participate.  The agreement was customized so that Dr. Drake could have access to McGrath's medical records related to his private medical condition, which was the subject of the 2004 lawsuit.  Dr. Drake submitted her FFD evaluation on February 5, 2010.  She indicated that if closely monitored, McGrath could return to work, but that he should undergo continued therapy and evaluation.  Avondale submitted a request for

---

[3]Doc. 30-1 at p. 33 (Ex. 3).

[4]Doc. 36-1 at 2 (Ex. 1); Doc. 36-1 at pp. 40-48 (Ex. 9).

[5]Doc. 36-1 at 2 (Ex. 1); Doc. 36-1 at pp. 45-46 (Ex. 9).

[6]Doc. 30-1 at pp. 44-50 (Ex. 7).

1  clarification to Dr. Drake, indicating that while McGrath's PIP indicated he would have

2  supervision, he would still be operating independently at times if cleared to return to

3  work.  On February 23, 2010, Dr. Drake stated, with that information, she believed

4  McGrath was not fit to work independently.[7]  She reiterated her recommendation that

5  McGrath undergo therapy.  McGrath was informed of Dr. Drake's decision on March 25,

6  2010.

7        McGrath followed through on Dr. Drake's recommendations and underwent

8  psychotherapy, a psychiatric evaluation, and an independent medical evaluation.  The

9  doctors conducting those sessions and evaluations submitted their records and

10  conclusions to Drake for her review.  In the meantime, in May of 2010, McGrath's

11  lawyer wrote a letter to Avondale demanding that he be allowed to return to work or

12  else legal action would be taken.[8]  No legal action resulted.

13        Dr. Drake conducted a re-evaluation of McGrath and issued a recommendation

14  on July 26, 2010, based on her own evaluation and the reports of the other doctors.[9]  In

15  her report, Drake acknowledges that McGrath's therapist had concluded he could return

16  to work, but she believed, based on her evaluation of the therapist's letters and her

17  follow-up discussion with the therapist, that McGrath had not been forthright and honest

18  with the therapist and that the therapist was not aware of some of the specific work

19  problems described in the PIP.  She also notes in her report that McGrath had tried to

20  bid on a shift at work and got upset when told he could not because of the PIP.

21  McGrath told her that he forgot about the PIP.  She ultimately concluded that McGrath

22  was not yet fit for duty and that he needed to show continued compliance and progress

23  with his therapy.  She also recommended that, given his history of head trauma and

24  chronic illness that could cause cognitive effects, McGrath be given a

25

26        [7]Doc. 30-1 at p. 73 (Ex. 10).

27        [8]Doc. 30-1 at p. 78 (Ex. 12).

28        [9]Doc. 30-1 at pp. 64-71(Ex. 9).

-4-

1  neuropsychological evaluation and that his prescription drugs be evaluated to see
2  which of those may have cognitive side effects.[10]  McGrath was informed of Drake's
3  decision on August 5, 2010.[11]

4      In October of 2010, McGrath's short-term disability ended and he remained on
5  administrative leave but without pay.  McGrath applied for social security benefits based
6  on his disability, as well as for disability retirement.  He underwent some neurological
7  testing from doctors in association with applying for various benefits.  Those tests
8  indicated that he did not have a head injury or cognitive defects.  McGrath then
9  requested that he be able to return to work, but Reyes told him he could not return until
10 he met with Dr. O'Brien, who Avondale specifically contracted with to perform an
11 independent neuropsychological evaluation of McGrath, and until Drake had a chance
12 to review Dr. O'Brien's report.[12]

13     In March of 2011, McGrath met with Dr. O'Brien.  Dr. O'Brien was tasked with
14 determining whether McGrath's issues with memory recall were purposeful, situational,
15 or due to a medical condition.[13]  Dr. O'Brien concluded that McGrath did not have a
16 neurological condition that would explain why McGrath "would have experienced
17 difficultly complying with office policies or providing accurate and reliable information to
18 Dr. Drake in the context of her fitness for duty evaluation."[14] Instead he concluded that
19 personality factors and atypical bereavement contributed to McGrath's work-related
20 difficulties.[15]

21

22 _____

23 [10]Doc. 30-1 at pp. 70-71 (Ex. 9).

24 [11]Doc. 36-2 at pp. 39-40 (Ex. 15).

25 [12]Doc. 36-2 at p. 42 (Ex. 16).

26 [13]Doc. 36-2 at p. 15 (Ex. 13).

27 [14]Doc. 36-2 at p. 34 (Ex. 13).

28 [15]Doc. 36-2 at p. 34 (Ex. 13).

Reyes and McGrath communicated about scheduling another FFD evaluation with Drake so she could reconsider McGrath's status in light of the new information.[16] After delays in scheduling, rather than move forward with a third evaluation from Drake in December of 2011, McGrath decided to pursue legal action in earnest.  He filed a Notice of Claim against Avondale on January 18, 2012, alleging that Avondale violated his state civil rights by discriminating and retaliating against him for filing a lawsuit against Avondale in 2004.  On April 26, 2012, he filed a Charge of Discrimination with the Arizona Attorney General's Office, alleging that Avondale retaliated against him for filing the 2004 lawsuit.  On May 8, 2012, Officer McGrath filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission, indicating that he was filing a claim under the Americans with Disability Act ("ADA") and attaching his state Charge of Discrimination.  He then filed a complaint against Avondale in state court in August of 2012.[17]  The complaint listed four claims for relief:

1)    A wrongful termination claim pursuant to A.R.S. § 12-341.01(A);

2)    A retaliation claim (the complaint does not indicate whether he is bringing the retaliation claim under state law, federal law, or both).

3)    A disability discrimination claim pursuant to "Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq."

4)    A disability discrimination claim pursuant to A.R.S. § 41-1463 et seq.

Avondale removed the case to federal court on September 11, 2012.

The gist of McGrath's claims is that his FFD evaluation has been unreasonably long and intrusive, and that Drake's refusal to clear him to return to work is unjustified in light of the other doctors' positive evaluations, demonstrating Avondale's discriminatory and retaliatory motives.

---

[16]Doc. 36-3 at pp. 27-62 (Exs. 22, 23).

[17]Doc. 1-1.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18]  The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[19]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[20]  However, summary judgment is mandated under Rule 56(c) "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[21]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[22]  Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[23]  Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[24]  All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the

---

[18]Fed. R. Civ. P. 56(a).

[19]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[20]*Id.*

[21]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[22]*Id.* at 323.

[23]*Id.* at 323-25.

[24]*Anderson,* 477 U.S. at 248-49.

1  non-movant.[25]  However, the non-moving party may not rest upon mere allegations or

2  denials, but must show that there is sufficient evidence supporting the claimed factual

3  dispute to require a fact-finder to resolve the parties' differing versions of the truth at

4  trial.[26]

## IV.  DISCUSSION

6  **A. Wrongful termination**

7         Avondale seeks summary judgment in its favor on McGrath's wrongful

8  termination claim based on the fact that McGrath has not been terminated.  Although

9  McGrath does not specify in his complaint the statute on which he bases his claim, the

10  parties and the court presume he is relying on the Arizona Employment Protection Act

11  because he alleges that he was terminated "in violation of public policy."[27]  However,

12  McGrath has not been terminated; Avondale considers him an inactive employee

13  pending completion of the FFD evaluation with Dr. Drake.  McGrath admits that

14  Avondale did not terminate his employment, and McGrath has not argued that he has

15  been constructively discharged.  Indeed, in his response brief, McGrath fails to even

16  address or present an argument in opposition to Avondale's request for summary

17  judgment on his wrongful termination, effectively waiving such a claim.[28]

18  **B. Retaliation**

19         McGrath's second claim for relief alleges that Avondale's decision to subject him

20  to a lengthy FFD evaluation process is retaliation for his 2004 lawsuit.  McGrath's

21  complaint fails to specify the basis for his retaliation claim, but regardless of whether

22  McGrath's retaliation claim is based on state or federal law, McGrath has failed to

---

24         [25]*Id.* at 255.

25         [26]*Id.* at 248-49.

26         [27]A.R.S. § 23-1501(A)(3)(b).

27         [28]*Foster v. City of Fresno*, 392 F. Supp. 2d 1140, 1147 n.7 (E.D. Cal. 2005) ("[F]ailure of
28  a party to address a claim in an opposition to a motion for summary judgment may constitute a
waiver of that claim.").

present evidence demonstrating a prima facie case of retaliation.  Under both the

Arizona Civil Rights Act ("ACRA") and the ADA, in order to establish a prima facie case

of discrimination to survive summary judgment, McGrath must establish that there was

a causal connection between the protected activity—the filing of the 2004 lawsuit—and

the adverse employment action—subjecting McGrath to a PIP and an FFD evaluation in

2009.[29]  The standard of proof for the causation element in an ADA retaliation claim is

currently unsettled.  Until recently, it was clear that a plaintiff bringing an ADA retaliation

claim could establish the requisite causation by showing that the protected activity was

a motivating factor in the adverse employment decision.[30]  However, in a recent

Supreme Court case involving retaliation claims brought under Title VII, *University of*

*Texas Southwestern Medical Center v. Nassar*,[31] the Court concluded that the causal

link between the protected activity and the employer's adverse action in a Title VII

retaliation claim must be "proved according to traditional principles of but-for causation,"

meaning that a plaintiff must show by preponderance of the evidence that the adverse

employment action would not have occurred in the absence of the protected activity.[32]

While "the Ninth Circuit has not had an occasion to apply *Nassar* to ADA retaliation

claims," retaliation claims under the ADA are adjudicated under the same standards as

---

[29]*Brown v. City of Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003) (setting forth the elements needed to demonstrate a prima facie case of retaliation under the ADA); *MacLean v. State Dept. of Educ.,* 986 P.2d 903, 912 (Ariz. Ct. App. 1999).

[30]*Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005).

[31]133 S.Ct. 2517 (2013).

[32]*Id.* at 2533.

1   Title VII retaliation claims,[33] and thus district courts have applied this more restrictive

2   causation standard to ADA retaliation claims as well.[34]

3        Whether the court applies the more restrictive test for causation, the but-for test,

4   or the more lenient test, the motivating factor test, McGrath has not put forth sufficient

5   evidence to survive summary judgment.  McGrath filed his lawsuit in 2004.  The parties

6   settled the lawsuit that year.  After the lawsuit, McGrath received standard raises and

7   positive evaluations.  The only alleged adverse employment action occurred five years

8   later in 2009 when he was placed on administrative leave and subjected to a FFD

9   evaluation and a PIP after he had an emotional breakdown while on duty and after

10  some work deficiencies noted by his supervisor.  McGrath does not dispute these facts,

11  and given these undisputed facts, McGrath cannot meet the but-for causation test.

12       Even if the more lenient standard is applied, there is no temporal proximity

13  between the lawsuit and the adverse employment actions in 2009, and McGrath points

14  to no other evidence that Avondale's decisions constituted retaliation for his 2004

15  lawsuit.[35]  Indeed, McGrath failed to specifically address the issue of his prima facie

16  case for *retaliation* in his response brief.[36]  He argues that Drake's refusal to clear him

17

18       [33]*Brooks v. Capistrano Unified Sch. Dist.*, No. SACV 12-01934- JLS, 2014 WL 794581,
19  at * 6 (C.D. Cal. Feb. 20, 2014); *see Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir.
    2000) (en banc) (adopting the Title VII retaliation framework for ADA retaliation claims), *vacated
20  on other grounds, U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

21       [34]*See Carvajal v. Pride Indus., Inc.*, No. 10cv2319-GPC, 2014 WL 1921732, at * 6 (S.D.
    Cal. May 14, 2014) (listing district courts that have held Nassar's but-for causation standard in
22  Title VII cases applicable to ADA retaliation claims.)

23       [35]*Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 646 (9th Cir. 2003) (finding no casual link
    where the protected activity occurred more than a year before the adverse employment action
24  and the plaintiff failed to provide other "evidence of surrounding circumstances that show a
    retaliatory motive.").
25

26       [36]McGrath's response brief sets forth an argument as to why he has presented a prima
    facie case of disability discrimination under Arizona state law and under the ADA.  Again, count
27  two is a retaliation claim.  The court presumes that his argument was meant to apply to his third
    and fourth claims; the two claims alleging disability discrimination.  Those two claims do not
28  survive summary judgment for other reasons, as discussed more specifically below.

1  for duty despite the positive evaluations and clearances he received from other doctors

2  is evidence of discrimination based on his confidential medical condition.  However,

3  McGrath's second claim for relief is a retaliation claim, and McGrath does not present

4  any evidence linking the 2004 lawsuit to Avondale's decision to place McGrath on

5  administrative leave in 2009.

6      Assuming McGrath has somehow presented a prima facie case of retaliation, his

7  claim still fails.  Avondale has presented evidence to show that its decision to put

8  McGrath on administrative leave and subject him to a PIP were based on events that

9  took place in 2009, particularly the emotional breakdown he had while at work.

10  McGrath has failed to rebut that legitimate reason.[37]

11  **C. Title VII discrimination**

12      McGrath's third claim for relief is brought pursuant to Title VII.  Specifically, he

13  alleges that he is a member of a protected class under Title VII because of his

14  confidential medical condition.  However, disabled persons do not constitute a

15  protected class under Title VII; Title VII only prohibits discrimination based on race,

16  color, religion, sex, or national origin.[38]  It is unclear why McGrath chose to rely on Title

17  VII rather than the ADA, but he has not sought to amend the complaint, nor did he

18  adequately address this issue in his response brief.  Instead, he cites *Trent v. Valley*

19  *Electric Ass'n Inc.*,[39] to argue that he has made out a prima facie case of discrimination

20  under Title VII.  *Trent*, however, involved issues of discrimination based on sex, not

21  disability.  Moreover, it involved a retaliatory discharge claim and addressed whether

22

23  [37]In evaluating ADA retaliation claims, the Ninth Circuit applies the burden-shifting
   analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Brown v. City of*
24  *Tucson,* 336 F.3d 1181, 1186 (9th Cir. 2003).  Thus, upon the plaintiff's showing of a prima
   facie case of retaliation, if an employer demonstrates that there was a legitimate,
25  nondiscriminatory reason for the adverse action, the plaintiff must then rebut that reason by
   showing that it is a pretext for retaliation.  *McDonnell Douglas*, 411 U.S. at 802-04.
26

27  [38]42 U.S.C. § 2000e-2(a).

28  [39]41 F.3d 524 (9th Cir. 1994).

-11-

1  the plaintiff had engaged in a protected activity.  It is not relevant to McGrath's disability

2  discrimination claim.[40]  There is no other explanation as to why McGrath seeks relief

3  under Title VII.  Indeed, he admits that he has not suffered any discrimination based

4  upon on his national origin, race, color, religion, or sex.[41]

5  **D. State law discrimination**

6       McGrath's final claim is one for disability discrimination pursuant to ACRA.

7  Avondale argues that summary judgment is appropriate as to this claim because

8  McGrath failed to timely file the requisite state notices.  Under A.R.S. § 12-821.01 any

9  person who asserts a claim against a public entity must file a notice of that claim within

10 180 days after the cause of action accrues.[42]  A cause of action accrues when the

11 person "realizes he or she has been damaged and knows or reasonably should know

12 the cause, source, act, event, instrumentality or condition that caused or contributed to

13 the damage."[43]  Similarly, pursuant to ACRA any person asserting a claim pursuant to

14 the act must file a charge of employment discrimination with the Civil Rights Division of

15 the Arizona Attorney General's Office within 180 days after the alleged unlawful

16 employment action occurred.[44]

17      The court will focus on the charge of discrimination, given that count four is a

18 claim brought under the ACRA.  McGrath was required to file his charge of

19 discrimination within 180 days after the alleged unlawful employment action occurred.

20 McGrath filed his charge of discrimination on April 26, 2012.  It is not entirely clear when

21

22      [40]McGrath's response brief frames count three as a retaliation claim under Title VII.  But
   a close reading of the complaint indicates that count three is a claim that he suffered purposeful
23 and intentional discrimination because of his confidential medical condition.  Regardless, Title
   VII is inapplicable whether count three is a discrimination claim or a retaliation claim.
24

25      [41]Doc. 30 at ¶ 40.

26      [42]A.R.S. § 12-821.01(A).

27      [43]A.R.S. § 12-821.01(B).

28      [44]A.R.S. §§ 41-1471(A) to -1481(A).

1   the 180-day clock began to run.  If the alleged employment action occurred when he

2   was placed on the PIP, then he had 180 days from November 10, 2009 to file a charge.

3   April 26, 2012 is well past that deadline.  If the alleged employment action occurred

4   when Dr. Drake first found him unfit for duty, then he had 180 days from March 25,

5   2010, to file a charge.  Again, he clearly missed the deadline.  If the alleged

6   employment action occurred when Dr. Drake found him unfit for duty a second time,

7   despite the positive evaluation he received from his therapist, then he had 180 days

8   from August 5, 2010 (the date he found out about Dr. Drake's second FFD evaluation).

9   Once more, he missed the deadline. If the adverse employment action occurred when

10  his short-term disability benefits ceased and he remained on leave without pay, he had

11  180 days from October 7, 2010, to file a charge, but missed the deadline.

12         McGrath argues it was not until the third FFD evaluation with Dr. Drake was

13  scheduled, on December 27,  2011, that it became clear Avondale was unjustifiably

14  keeping him on administrative leave.  He argues that his deadline should be measured

15  from this date and that he filed both his notice of claim and his charge of discrimination

16  within 180 days of such date.  The court is not persuaded by McGrath's argument.  It is

17  disingenuous for McGrath to claim that the alleged unlawful employment action did not

18  take place until December of 2011 or that he could not have reasonably known of his

19  claim until that time.  Reyes clearly informed McGrath and McGrath clearly understood

20  long before such time that Dr. Drake had to undertake a third FFD in light of the

21  additional information provided by Dr. O'Brien and his other providers.  Specifically, the

22  record shows that Reyes informed McGrath on December 14, 2010, that he was going

23  to be required to go through a neuropsychological evaluation with Dr. O'Brien, even

24  though he already had been cleared of any head trauma by another doctor.[45]  She also

25  informed him at that time that Dr. Drake would have to review those results.[46]  Thus, he

26

27         [45]Doc. 36-2 at p. 42.

28         [46]Doc. 36-2 at p. 42.

-13-

knew or should have known about the third evaluation on December 14, 2010, and using that as the date of the alleged unlawful employment action, McGrath filed his charge of discrimination too late.

Even disregarding the communication between Reyes and McGrath on December 14, 2010, the record shows that McGrath knew as of August 11, 2011, that he had to see Dr. Drake again.[47]  Using this later date, McGrath still failed to timely file his charge of discrimination.  Viewing the evidence in favor of McGrath, he did not comply with ACRA's 180-day deadline.

## V.  CONCLUSION

Based on the preceding discussion, Avondale's motion for summary judgment at docket 29 is GRANTED.

DATED this 24th day of June 2014.

_____
/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

_____

[47]Doc. 36-3 at p. 31.

-14-